# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50654

United States Court of Appeals
Fifth Circuit

**FILED**
July 16, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

CHARLES AUGUSTUS BANKS, IV, also known as Charles Banks, IV, also known as Charles A. Banks, also known as Charles Augustus Banks,

      Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:16-CR-618-1

Before REAVLEY, JONES, and GRAVES, Circuit Judges.

PER CURIAM:*

Charles Banks appeals his 48-month sentence after pleading guilty to wire fraud. Specifically, Banks asserts that the record does not support the district court's actual-loss calculation and that the district court erred in applying a two-level enhancement for gross receipts from a financial institution. We AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-50654

## FACTS AND PROCEDURAL HISTORY

Charles Banks, an investment counselor and venture capitalist, was a friend and financial advisor of former National Basketball Association (NBA) player Tim Duncan. Banks had previously been employed with Duncan's investment firm and, after leaving the firm, remained in contact with Duncan, leading him to believe Banks was still his financial advisor. Banks was also the chairman of and held a controlling interest in a sports-merchandising company, Gameday Entertainment, LLC.

In 2012, Banks procured a line of credit for Duncan and convinced him to loan Gameday $7.5 million for "first position" as a creditor with security interest in Gameday's assets. In 2013, Gameday was still undergoing financial difficulties and Banks convinced Duncan to co-guarantee a $6 million loan from Comerica Bank. Comerica agreed to loan Gameday $6 million as long as both Duncan and Kevin Garnett, another professional basketball player and associate of Banks, each agreed to guarantee the loan and all other creditors would subordinate their security interests to Comerica. To obtain Duncan's agreement, Banks lied to him about the details of the loan and convinced him that the agreement was actually going to reduce the outstanding principal on his existing $7.5 million loan. In reality, the signature pages faxed over by Banks were part of an agreement for Duncan to take on a new $6 million contingent liability and subordinate his existing security interest in Gameday's assets for the previous $7.5 million loan. This occurred while Duncan was competing in the NBA Finals. Following the $6 million loan from Comerica, Gameday paid Banks over $1.5 million. Banks neither paid this money to Duncan nor to the Bank to reduce the principal on the original loan. Further, the record indicates that Banks kept a significant portion of the original $7.5 million loan to Gameday.

2

No. 17-50654

After the fraud came to light, Banks was ultimately indicted on four counts of wire fraud in violation of 18 U.S.C. § 1343. Banks pleaded guilty to one count of wire fraud without a plea agreement. At the time of sentencing, Gameday had dissolved, leaving Duncan's original $7.5 million loan in complete default and uncollectable. Likewise, Gameday defaulted on the $6 million loan from Comerica. Garnett, the other co-guarantor on the $6 million loan, entered into a settlement agreement with Comerica to pay back the $6 million loan. The record indicates that Garnett had paid back approximately $1.98 million so far. However, Comerica reserved its rights against Duncan for the entire $6 million.

The Presentence Investigation Report (PSR) determined that both the $7.5 million and the $6 million loans resulted in an "actual loss' of $13.5 million and applied a corresponding 20-level enhancement under U.S.S.G. §2B1.1(b)(1)(K). Banks objected to the amount of loss attributed to him and argued that there is no loss. The probation officer responded that:

> Pursuant to USSG §2B1.1, comment. (n.3 [A][i]), actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense. The $7,500,000 loan was considered a loss when it was used as the conduit to fraudulently obtain the $6,000,000 loan. It is reasonably foreseeable to include both loans given the context of the text messages between the defendant and Tim Duncan. Gameday's dissolution and default on the $7,500,000 loan further solidifies the total actual loss to $13,500,000.

The PSR also recommended a two-level enhancement for use of sophisticated means, a two-level enhancement for deriving more than $1 million in gross receipts from a financial institution, and a two-level enhancement for abuse of a position of trust. The PSR recommended a three-level reduction for acceptance of responsibility. The district court adopted the PSR with the exception of the sophisticated means enhancement. Banks ended up with a total offense level of 28, resulting in a guidelines range of 78 to 97

3

months.  The district court sentenced him below the guidelines range to 48 months imprisonment with 3 years of supervised release, and ordered him to pay Duncan $7.5 million in restitution.  Banks subsequently filed this appeal.

## STANDARD OF REVIEW

We review a district court's sentencing decision for an abuse of discretion.  *United States v. Harris,* 597 F.3d 242, 250 (5th Cir. 2010).  The district court's interpretation or application of the federal sentencing guidelines is reviewed de novo, and its factual findings are reviewed for clear error.  *United States v. Johnson,* 619 F.3d 469, 472 (5th Cir. 2010); *see also United States v. Sandlin*, 589 F.3d 749, 756 (5th Cir. 2009).   "There is no clear error if the district court's finding is plausible in light of the record as a whole." *Harris*, 597 F.3d at 250 (internal marks and citation omitted).

## DISCUSSION

### I. Actual Loss Calculation

Banks asserts that the record does not support the district court's $13.5 million actual-loss calculation.  Specifically, Banks argues that the district court erred in including the $6 million loan because Duncan did not suffer a loss of $6 million and will never be required to pay $6 million.  Banks also argues that the district court erred in including the $7.5 million loan because that was a legitimate investment unrelated to the offense conduct, the losses were not caused by Banks, and Duncan received some interest payments on the loan.  Banks further asserts that any loss related to the $7.5 million 2012 loan cannot be considered relevant conduct to the $6 million fraud in 2013.

The government counters that the $6 million is properly included because it was obtained through the fraud to which Banks has pleaded guilty. Also, despite Garnett's agreement to repay this amount, it has not been paid in full and Comerica reserved its rights against Duncan for the full amount. The government further asserts that the original $7.5 million loan was used as

a conduit to fraudulently obtain the $6 million loan from Comerica, and that the fraud involved tricking Duncan into subordinating his security interest for the original $7.5 million loan and then Banks paying himself rather than reducing Duncan's "exposure" as he claimed he was doing. Thus, the $7.5 million was also properly included in the actual-loss calculation. The government alternatively asserts that, even if we were to find that Duncan's loss did not directly result from the defendant's fraudulent scheme, the $7.5 million is still directly attributable to Bank's relevant conduct.

Under the sentencing guidelines, a defendant's sentencing range can be enhanced according to the amount of the loss. U.S.S.G. § 2B1.1(b)(1). Under, U.S.S.G. § 2B1.1(b)(1)(K), if the fraud loss is more than $9.5 million, the offense level is increased by adding 20 levels. The guidelines comments provide that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A). The government presented this as an actual loss case. "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. 3(A)(i). "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money." U.S.S.G. § 2B1.1 cmt. 3(A)(iii). Whereas, "'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 cmt. 3(A)(iv).

As this court has said, "the guidelines emphasize the deference that must be shown to the sentencing judge, who is in a unique position to assess the applicable loss, so this court need only determine whether the district court made 'a reasonable estimate of the loss.' U.S.S.G. § 2B1.1 cmt. 3(C)." *United States v. Hebron*, 684 F.3d 554, 660 (5th Cir. 2012). Further, "[t]his court need not determine whether the district court's estimate was the most reasonable, but rather only that it is a reasonable calculation." *Id.* at 564.

No. 17-50654

This court has also acknowledged that:

> [A]ctual loss "incorporates [a] causation standard that, at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (i.e., guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)." U.S.S.G. SUPP 2 APP. C, AMENDMENT 617 (NOVEMBER 1, 2001).

*United States v. Olis*, 429 F.3d 540, 545 (5th Cir. 2005). While acknowledging that there must be a factual basis for the conclusion that losses were the result of fraud, we have also concluded that we cannot include the loss where the loss would have occurred even without the fraud. *United States v. Randall*, 157 F.3d 328, 331 (5th Cir. 1998).

Here, Banks explicitly tied the $6 million fraud to the $7.5 million loan by presenting it as an amendment to the $7.5 million loan and both transactions defrauded the same person – Duncan. The following text exchange occurred on June 4, 2013:

> Banks: "On the good news front Gameday is crushing. We are changing your 7.5m loan to 6m. Paying it down 1.5m.[1] Sending you an amendment to the loan I need you to send back when you get it. Turning out to be even better than I hoped."
>
> Duncan: "Why are we changing the loan?? If its crushing should I get more of the company?? Or at least what was agreed upon?? I'm confused."
>
> Banks: "My fault for not explaining more clearly. Your exposure is going down but your upside remains and your monthly payments remain. This just removes 1.5m of risk for you. All GrEAT news. No downside."

---

[1] Following the fraudulently induced $6 million loan, Duncan's $7.5 million loan was not paid down $1.5 million as promised. Instead, Banks paid himself over $1.5 million.

6

No. 17-50654

Banks knew or reasonably should have known that defrauding Duncan into signing an "amendment" to the $7.5 million loan had the potential result of $13.5 million in pecuniary harm or actual loss.  Banks knew or reasonably should have known this because the "amendment" was actually a brand new $6 million loan wherein Duncan unknowingly agreed to subordinate his creditor position on the existing $7.5 million loan.  Not only did the "amendment" not remove $1.5 million or any amount of risk from the $7.5 million loan as Banks fraudulently claimed, but it added $6 million in risk and subordinated Duncan's security interest for the $7.5 million to Comerica's interest.  Further, the record indicates that Banks kept a significant portion of the $7.5 million loan, paid himself over $1.5 million out of the $6 million loan, and that Comerica received some payments from collateral.

In other words, but for Banks' fraudulent conduct: Duncan's $7.5 million loan would have been paid down $1.5 million; Duncan would not have agreed to subordinate his creditor position on the $7.5 million; Duncan would not have agreed to loan an additional $6 million for which Comerica has retained its rights against him; Comerica would not have agreed to the $6 million loan without Duncan's guarantee; and Banks would not have paid himself more than $1.5 million out of the $6 million loan, leaving Gameday in a better financial position to provide some collateral to Duncan's first priority creditor status rather than pay that money to Comerica.  That alone indicates that a reasonable estimate of the loss reached the $9.5 million threshold for a 20-level enhancement under U.S.S.G. §2B1.1(b)(1)(K).  That's not even taking into consideration any amounts Banks paid to himself out of the $7.5 million, further weakening Gameday's financial position and available assets, or the actual $7.5 million loan, other than those excepted portions listed.

However, Banks clearly incorporated the entire $7.5 million into the fraud by presenting it as an "amendment" to the original loan.  Further, he

7

reasonably knew or should have known that paying himself significant portions of the loans, i.e., looting Gameday and reducing available collateral, while defrauding Duncan into loaning more and subordinating his creditor position had the potential result of $13.5 million in loss. U.S.S.G. § 2B1.1 cmt. 3(A)(iv). As set out in the indictment and the PSR, the one count of wire fraud explicitly encompassed both the new $6 million loan and the $7.5 million loan. Banks had notice of all of this.

Banks also argues that loss from the $6 million loan should be reduced by Garnett's payments to Comerica of nearly $2 million. The guidelines allow for credits against loss if the money is returned prior to the detection of the offense or "[i]n a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral." U.S.S.G. § 2B1.1 cmt. 3(E)(i)–(ii). However, this money was not returned prior to the detection of the offense and Garnett's payments did not derive from disposed collateral. Further, other circuits have held that post-fraud repayment by a third-party guarantor does not factor into loss calculation. *See United States v. Wilson*, 980 F.2d 259, 261-62 (4th Cir. 1992).

For these reasons, we conclude that the district court's actual-loss calculation of $13.5 million was not an unreasonable estimate.

## II. *Financial-Institution Enhancement*

Banks asserts that because he did not receive any funds directly from Comerica and only received funds from Gameday, an ordinary business, then the financial-institution enhancement should not apply. Alternatively, he asserts that, even if the enhancement applies to indirectly derived funds, the Government failed to trace those funds to him, and that he did not receive any funds "as a result" of his offense.

No. 17-50654

Under the sentencing guidelines, a two-level enhancement applies when "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(b)(16)(A). The guidelines define "gross receipts from the offense" as "all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." U.S.S.G.§ 2B1.1 cmt. 12(B). This court has said that "[a] defendant derives proceeds under § 2B1.1(13)(A) 'where he causes them to be lodged in another with the expectation that he will enjoy the benefits.'" *United States v. Gharbi*, 510 F.3d 550, 555–56 (5th Cir. 2007) (quoting *United States v. Edelkind*, 467 F.3d 791, 801 (1st Cir. 2006)). This is consistent with other circuits. *See United States v. Pendergraph*, 388 F.3d 109, 113 (4th Cir. 2004) (defendant had a controlling interest in the company and "thus controlled the fraudulently acquired funds"); *United States v. Stolee*, 172 F.3d 630, 631 (8th Cir. 1999) (per curiam) (defendant was "the sole owner and president" of the company); *cf. United States v. Colton*, 231 F.3d 890, 911–12 (4th Cir. 2000) (withholding the enhancement when the defendant held a non-controlling interest in the entity).

The district court here found specifically that "my sense is that Mr. Banks was definitely pulling the strings behind the curtain like the Wizard of Oz, and telling [the CEO] what to do, and send me this money and so forth." The record supports this finding that Banks had the necessary shareholder majority and control over Gameday to support application of the enhancement. Accordingly, we conclude that the district court did not err in applying the enhancement for gross receipts from a financial institution.

## CONCLUSION

For the reasons stated herein, we AFFIRM.