# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-30919

United States Court of Appeals
Fifth Circuit

**FILED**

September 28, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

　　　Plaintiff - Appellee

v.

TOM MCCARDELL,

　　　Defendant - Appellant

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:16-CR-212-1

Before SMITH, CLEMENT, and COSTA, Circuit Judges.

PER CURIAM:*

　　　Thomas McCardell was convicted by a jury of 14 counts of violating 42 U.S.C. § 1320a-7b(b)(2) for paying kickbacks for patient referrals. The district court calculated an enhancement under U.S.S.G. § 2B4.1 based on the value of the benefit received from Medicare for those patients, but varied downward and sentenced McCardell to 26 months in prison. McCardell appeals his conviction and sentence. For the following reasons, we affirm.

---

　　　* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-30919

## FACTS AND PROCEEDINGS

Thomas McCardell was a registered nurse living in Lafayette, Louisiana and working as an administrator for Physicians Behavioral Hospital (PBH). When PBH hired McCardell, it had 14 beds and offered psychological care for both in-patients and out-patients.

To achieve profitability, the hospital required a certain number of its beds to remain filled, and tried to stay above that number. To that end, the hospital employed "community educators" to inform potential referral sources (other hospitals, nursing homes, social workers, etc.) of the hospital's services. The community educators regularly submitted time sheets and logs to PBH, which documented the date and entity they visited, the name of their contact, the type of visit (i.e., in person or by phone), and the purpose of the visit.

What the community educators could not do was pay for referrals to PBH. *See* 42 U.S.C. § 1320a-7b(b)(2)(A). PBH's employee handbook expressly specified that employees should "[r]efrain[] from soliciting or offering anything that can be construed as a remuneration, kickback or bribe." PBH employees received a copy of this handbook and signed a statement that they received it and agreed to follow its rules. McCardell received a copy of the employee handbook in March 2011, and agreed "to comply with all terms and conditions set forth."

As administrator, McCardell oversaw the daily operations of PBH, hired new employees, negotiated contracts, and generally ensured that PBH complied with its legal obligations. He supervised and would also periodically evaluate the community educators.

In late 2011, McCardell became aware of Gloria Himmons, an Alabama resident who referred patients to hospitals for a fee. Gloria had spoken with Allison Cooper, an assistant administrator, about possibly sending patients to PBH. Cooper, in turn, told McCardell that Gloria had many referral sources,

2

No. 17-30919

but also warned him that a large number of Gloria's patients came from outside Louisiana, which would garner the attention of auditors.

McCardell reached out to Gloria, and they ultimately agreed that PBH would pay her $2,500 per month in exchange for referring an average of 15 patients every month. But there was a difficulty: because Gloria was also referring patients to a hospital in Florida, she felt it would be a "conflict of interest" for her to refer patients to PBH. Gloria asked if the hospital could make its payments to her through her son, Vander Himmons.

McCardell agreed that PBH would contract with and pay Vander instead of Gloria. Gloria testified that McCardell told her "he would have to draw up a contract to make it legit where . . . Vander is working for them, even though [she] would be doing the work." Gloria sent Vander's resume to McCardell, and he hired Vander as a community educator. She also signed paperwork in Vander's name, some of which indicated, falsely, that Vander had received training at PBH.

Over the course of many months, neither Vander nor Gloria ever visited PBH or performed any of the duties a community educator usually performed. They never once filled out a time sheet or log. But Gloria referred almost 90 patients to the hospital, some multiple times. At times, a majority of the patients at PBH were referrals from Gloria. Medicare was billed over $6,000,000 for these patients and paid out over $1,000,000. PBH paid about $40,000 to Gloria for the referrals through checks made out to Vander.

At some point, the hospital was low on patients and its revenues dropped. McCardell determined that PBH should contact Gloria to obtain more referrals. Some of the hospital staff grew worried that the patients Gloria referred were faking their symptoms. These staff members informed McCardell of their concerns, but he continued to do business with Gloria anyway.

3

No. 17-30919

Eventually, Gloria was charged with violating the anti-kickback statute for referring patients to the Florida hospital. She pleaded guilty and agreed to cooperate with the authorities. Gloria then signed a separate proffer agreement for statements she made to Louisiana investigators regarding her activities at PBH.

A federal grand jury in the Western District of Louisiana charged McCardell with 14 counts of violating the anti-kickback statute, 42 U.S.C. § 1320a-7b(b)(2)(A). McCardell pleaded not guilty, and a trial was held. The jury convicted him on all 14 counts. The district court denied McCardell's motions for judgment as a matter of law.

At sentencing, the district court determined that McCardell's sentence base level should be 8. On the advice of the presentence report, it applied a 14-level enhancement because the hospital received $1,046,329.13 in Medicare payment for patients Gloria referred and so "the improper benefit to be conferred" was between $550,000 and $1,500,000. *See* U.S.S.G. § 2B4.1(b)(1)(B); *id.* § 2B1.1(b)(1)(H). McCardell objected to the $1,046,329.13 figure, arguing it did not reflect that the Fifth Circuit has interpreted "improper benefit" to mean net benefit. *See United States v. Landers*, 68 F.3d 882, 884 (5th Cir. 1995).

Contending there must be some direct costs associated with housing and caring for the patients Gloria referred, McCardell called to the stand William Logan—PBH's owner—to try to determine the amount of those costs. Logan testified that he had received the subpoena for the information only days before and was unable in that short time period to gather all the information needed to determine the direct costs. McCardell argued that the costs were not ascertainable, so under the guidelines the court should use the amount of the bribes paid to Gloria to determine the sentence enhancement. *See* U.S.S.G.

No. 17-30919

§ 2B4.1 cmt. n.6. If the court had used the bribe amount advocated by McCardell, his sentencing guidelines range would have been 10–16 months.

The court rejected McCardell's argument that the direct costs were unascertainable. The court found that Logan's testimony demonstrated that the costs were calculable if he had been allowed sufficient time. On the advice of McCardell's lawyer, and language from this court's opinion in *Landers*, the district court held that McCardell bore the burden of proof to demonstrate the amount of the direct costs. *See Landers*, 68 F.3d at 885. The district court concluded that McCardell failed to meet that burden, so it used the $1,046,329.13 figure when calculating his sentence enhancement. This was McCardell's first offense, so his criminal advisory-guidelines range was 41–51 months.

The court varied downward from the guidelines recommendation. The court based its decision on several factors: McCardell was 64 years old and had never before been charged with a crime; he was unlikely to reoffend given his age and the nature of the crime; a reduced fine would increase McCardell's ability to pay the fine; and he personally received only the indirect benefit of looking better in his job. However, the court also noted that McCardell's failure to admit responsibility limited the downward variance and that it needed to impose a prison sentence to uphold the "statutory goal for promoting respect for the law."

The court stated it was "exercising its discretion to vary and that this is the sentence that this Court would choose for this crime, having tried the case and knowing the facts, without regard to the guideline range itself." The district court sentenced McCardell to prison for a term of 26 months as to each count, to run concurrently, and set a fine of $20,000.

Finally, the district court added that its sentencing decision was "not based on any reduction of the guideline range, but is instead this Court's

No. 17-30919

reflection of this Court's own discretion to disagree with the guideline ranges in this matter." Putting a finer point on it, the court stated that "if in fact [McCardell's attorney] is successful in arguing on appeal, that he should not have had the burden to prove the direct cost, that . . . is irrelevant to what the Court has done here today."

McCardell timely appealed his conviction and sentence.

## STANDARD OF REVIEW

A district court's denial of a motion for judgment of acquittal is reviewed de novo. *United States v. Williams*, 520 F.3d 414, 420 (5th Cir. 2008). Nevertheless, when reviewing a sufficiency of the evidence claim, the court must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). All the evidence must be viewed "in the light most favorable to the prosecution." *Id.* In other words, "this Court's inquiry is limited to whether the jury's verdict was reasonable" and not whether the court believes it was correct. *United States v. Alaniz*, 726 F.3d 586, 601 (5th Cir. 2013) (quotation omitted).

Turning to the sentencing issue, in general this court reviews sentences for reasonableness. *United States v. Claiborne*, 676 F.3d 434, 437 (5th Cir. 2012) (per curiam). We consider whether the district court committed either significant procedural or unreasonable substantive error. *Id.* Legal conclusions are reviewed de novo and factual findings are reviewed for clear error. *United States v. Hinojosa*, 749 F.3d 407, 411 (5th Cir. 2014). When a defendant challenges the methodology of a sentence calculation, the panel reviews de novo. *United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012).

No. 17-30919

## DISCUSSION

*A. Sufficiency of the Evidence*

The anti-kickback statute criminalizes "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to" obtain referrals for people seeking services to be paid for under a federal health care program. 42 U.S.C. § 1320a-7b(b)(2). There are safe harbor provisions built into the prohibition on offering kickbacks, including the "personal services and management contracts" provision, which immunizes against prosecution those who meet all of seven specific standards. *See* 42 C.F.R. § 1001.952(d).[1]

---

[1] The seven standards are as follows:

(1) The agency agreement is set out in writing and signed by the parties.

(2) The agency agreement covers all of the services the agent provides to the principal for the term of the agreement and specifies the services to be provided by the agent.

(3) If the agency agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

(4) The term of the agreement is for not less than one year.

(5) The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

(6) The services performed under the agreement do not involve the counselling or promotion of a business arrangement or other activity that violates any State or Federal law.

(7) The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

42 C.F.R. § 1001.952(d).

7

No. 17-30919

McCardell first contends he did not "knowingly and willfully" make payments to Gloria with the specific intent to disobey or disregard the law prohibiting kickbacks. He argues there was no direct evidence that he was aware that it was "generally illegal to make such payments." In support of this contention, he cites evidence suggesting that Gloria had no awareness that her conduct was illegal; the payments he made to Gloria were not specifically tied to a given number of patients; he did not attempt to hide his arrangement with Gloria from Logan; he did not personally benefit from his arrangement with Gloria except that the hospital remained open and he kept his job; and he did not "lawyer up" when confronted about his practice of paying Gloria kickbacks. And, although the agreement with Vander may not have been legal, McCardell contends it did not violate the anti-kickback statute.

The government marshaled enough evidence for the jury to conclude that McCardell acted knowingly and willfully. McCardell, as PBH's administrator, knew that the hospital could not pay for referrals because he had a copy of the employee handbook setting forth his legal obligations—including the obligation not to offer kickbacks—and agreed "to comply with all terms and conditions set forth." He supervised community educators, which suggests he understood their job and legal responsibilities. Gloria's and Vander's actions never comported with those of PBH's community educators. The fact that McCardell signed Vander up as a community educator, even though neither Vander nor Gloria ever performed any responsibilities usually associated with community educators, indicated that McCardell knew obtaining referrals from Gloria was illegal. In an attempt to make the arrangement look legitimate, McCardell gave Vander a false title.

Moreover, McCardell turned to Gloria when the hospital fell on hard times, even after being warned that too many out-of-state referrals would attract the attention of auditors. It is not unreasonable to believe that if

8

No. 17-30919

McCardell had believed Gloria's behavior to be legal, he would not have waited until things grew difficult before turning to Gloria to seek additional referrals. This is only compounded by the evidence that, as the number of referrals from Gloria increased, it became clear to members of PBH's staff that her patients were faking symptoms. McCardell continued to accept referrals from Gloria despite these concerns.

McCardell's attempt to rely on Gloria's supposed ignorance to demonstrate that it would be irrational for a jury to convict him is also unpersuasive. Even if Gloria were ignorant of the law, that says little about what McCardell, a hospital administrator in charge of ensuring compliance, knew or did not know. But, even accepting McCardell's premise that Gloria's knowledge was relevant to his understanding, there was more than enough evidence to suggest that she knew her actions were illegal. She pleaded guilty to the Florida charges. She testified she did not read the paperwork she signed in Vander's name when PBH hired her because she knew it was bogus. And she did not offer her own name as the source of the referrals.

The evidence indicating that McCardell was open about accepting the referrals from Gloria and the district court's finding that McCardell did not directly benefit from the scheme are also insufficient to show that no rational jury could find beyond a reasonable doubt that McCardell knew his conduct was illegal. The anti-kickback statute expressly proscribes any illegal payment made "overtly or covertly." 42 U.S.C. § 1320a-7b(b)(2). It would be a strange thing if jury verdicts could be nullified simply because defendants were unabashed about their criminal behavior. And although McCardell did not directly benefit financially, the district court found that he benefited indirectly because he looked "better in his job."

McCardell alternatively contends he attempted to comply with the "personal services and management contracts" safe harbor provision, and so

there was not sufficient evidence for the jury to convict him. He argues it must have been confusing for the jury to determine how the government's burden to prove him guilty beyond a reasonable doubt related to his burden of proof regarding the safe harbor defense. As evidence of this confusion, McCardell points to a jury note asking about one of the safe harbor standards and argues the jury instructions were confusingly worded.[2]

McCardell does not explain on appeal, nor did he argue at trial, how his conduct met the safe harbor provision, other than to say that he believes he entered into a legal contract with Vander. But there was more than enough evidence presented for a jury to conclude that McCardell did not meet, or even attempt to meet, the "personal services and management contracts" safe harbor provision. If anything, it seems that McCardell entered into the contract with Vander so that the relationship with Gloria would look legitimate to Logan and any auditors.

McCardell's contract with Vander also failed to meet at least two conditions necessary to achieve protection from the safe-harbor provision. First, the contract lacked an "agency agreement . . . set out in writing and signed by the parties." 42 C.F.R. § 1001.952(d)(1). Because McCardell's agreement was with Gloria, but signed by Vander, it cannot meet the safe harbor. Second, and perhaps more importantly, the contract did not accurately set out the services that Gloria provided to the hospital. *Id.* § 1001.952(d)(2). Vander was hired as a community educator, but Gloria did nothing other than

---

[2] McCardell acknowledges his attorneys did not object to the jury instructions, and so he does not challenge them on appeal. Instead, he argues that the confusingly worded instruction on the safe harbor explains why the "jury did not recognize the reasonable doubt it had before it." The jury was instructed that if it found beyond a reasonable doubt that McCardell had violated the statute, it should then consider whether he had met the safe harbor provision.

refer patients for a flat fee. It was reasonable for the jury to conclude the contract did not meet the safe harbor requirements.

There was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that McCardell knew that paying Gloria kickbacks violated the law. There was also sufficient evidence to show that he failed to meet any safe harbor provision of the anti-kickback statute. We affirm McCardell's conviction.

*B. Sentencing*

The applicable sentencing guideline is U.S.S.G. § 2B4.1, which fixes a base offense level of 8.  Enhancements are applied based on "the greater of the value of the bribe or the improper benefit to be conferred." U.S.S.G. § 2B4.1(b)(1). This court has previously held that "[a]lthough the guidelines do not explicitly state which costs should be deducted, the commentary demonstrates that, at the least, direct costs are deductible." *Landers*, 68 F.3d at 884.

McCardell raises two issues in his argument that the district court erred when it sentenced him: First, the district court improperly placed the burden of proof to demonstrate both the existence and the amount of direct costs on McCardell. Second, even assuming McCardell had the burden of proof, the district court erred when it found that he had not demonstrated that the "value of the improper benefit" could not be estimated, and so should have used the amount of the bribe to determine the sentencing enhancement.

## 1. Burden of proving direct costs

McCardell first argues that, as a general matter, the government bears the burden of proof to show that any sentencing enhancement is warranted. *See United States v. Richardson*, 781 F.3d 237, 249 (5th Cir. 2015); *United States v. Alfaro*, 919 F.2d 962, 965 (5th Cir. 1990). But he acknowledges that language from this court's decision in *Landers* frustrates this argument.

No. 17-30919

While reasoning its way to its holding that "value of the improper benefit to be conferred" means direct costs, the *Landers* court placed the burden of proof on the defendant to establish at least the existence of direct costs: "Because *Landers failed to establish* that [his employer] incurred any direct costs other than the [cost of goods sold], the district court's gross profit finding accurately represents the gross value of the contracts minus all direct costs associated with performing the contracts." *Landers*, 68 F.3d at 885 (emphasis added).

Based on this language, McCardell's counsel stated at the sentencing hearing that "as best [as he could] understand the reasoning of the Fifth Circuit in the *Landers* decision, we would have the burden of coming forward, showing that there were costs, direct costs. And we are prepared to meet that burden at this time." He repeated throughout the hearing that he had the burden to prove direct costs.

McCardell acknowledges that the district court and defense counsel understood *Landers* as putting the entirety of the burden of proof on him. But he contends that other circuit courts have placed the burden of proof on the government. *See United States v. Lianidis*, 599 F.3d 273, 281 (3d Cir. 2010) ("We hold at the outset that, although it is the Government's burden to show net value, the defendant bears the burden of producing the necessary documents. To hold otherwise would, in practice, prevent the Government from meeting its burden of proof." (quotation and citation omitted)); *United States v. Sapoznik*, 161 F.3d 1117, 1119 (7th Cir. 2001) ("[The government] made no effort to net out the costs associated with the gambling that the bribes facilitated. The government does not deny that it was its burden, not the defendant's, to provide evidence from which these costs could be estimated."). *But see United States v. DeVegter*, 439 F.3d 1299, 1305 (11th Cir. 2006) ("[T]he defendants[] have the burden of proving what direct costs should be subtracted

12

in determining the net improper benefit, and they have not satisfied this burden . . . .").

McCardell further argues that if he bears any burden at all, he bears only the burden to show that direct costs exist, not the burden to show the precise amounts of those direct costs. But as he acknowledges, and as the record shows, McCardell argued before the district court that he bore the entirety of the burden of proof.  If there was any error as to the burden of proof, McCardell invited the district court's holding that the burden was on him to establish direct costs. "A defendant may not complain on appeal of errors that he himself invited or provoked the [district] court . . . to commit." *United States v. Salazar*, 751 F.3d 326, 332 (5th Cir. 2014) (alterations in original). This court does not reverse invited error unless there is "manifest injustice," which is a standard more demanding even than plain error. *Id.* McCardell has not shown manifest injustice, especially considering the district court's substantial downward variance.

## 2. Using improper benefit instead of the value of the bribe

McCardell's final contention is that, even if he bore the burden of proof to demonstrate the amount of the direct costs, he met his burden because he demonstrated that per-patient costs could not be determined. The commentary to the guidelines states that when it is not possible to determine the net value of the improper benefit to be conferred, the amount of the bribe should be used to determine the appropriate increase in the offense level. *See* U.S.S.G. § 2B4.1 cmt. n.6. McCardell subpoenaed PBH owner Logan's documents, and Logan testified at trial that he had not been able to determine the direct costs per patient.

Contrary to McCardell's argument, the district court found that, as a factual matter, Logan's testimony demonstrated that the direct costs were calculable. It was only because McCardell delayed in subpoenaing the

No. 17-30919

hospital's documents—which were complex and possibly required expert testimony to decipher—that the direct costs could not be calculated. Because this is a factual finding, we review it only for clear error. *Hinojosa*, 749 F.3d at 411. McCardell waited until only a few days before the sentencing hearing to issue the subpoena. Logan testified that calculations of costs directly related to patients were available but that he was not familiar enough with them. The district court's determination was not clearly erroneous.

### 3. Harmless error

Even were we to find that the district court erred in its sentencing determination, the government argues that any error was harmless. There are two ways to demonstrate harmless error when the district court uses an incorrect guidelines range: "One is to show that the district court considered both ranges (the one now found incorrect and the one now deemed correct) and explained that it would give the same sentence either way." *United States v. Guzman-Rendon*, 864 F.3d 409, 411 (5th Cir. 2017). The other "requires that the proponent of the sentence convincingly demonstrate[] both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." *Id.* (alteration in original) (quotation omitted).

Even if the district court erred in its guidelines range determination, its ultimate sentence would meet the second standard. The court explained its evaluation of the facts and circumstances of the case to determine McCardell's sentence. It then stated it was "exercising its discretion to vary and that this is the sentence that this Court would choose for this crime, having tried the case and knowing the facts, without regard to the guideline range itself." It added that its decision to vary was "not based on any reduction of the guideline range, but [was] instead this Court's reflection of this Court's own discretion to disagree with the guideline ranges in this matter." Most importantly, the

14

district court stated that "if in fact [McCardell's attorney] is successful in arguing on appeal, that he should not have had the burden to prove the direct cost, that . . . is irrelevant to what the Court has done here today." Given the district court's explanation, if the court used an incorrect guidelines range, the government has convincingly demonstrated that the court would have imposed the same sentence for the same reasons had it not erred in determining the applicable range.

McCardell's reliance on *Molina-Martinez v. United States*, 136 S. Ct. 1338 (2016), to rebut this finding is unavailing. The Supreme Court noted that the error of sentencing a defendant under an incorrect guidelines range "can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Id.* at 1345. However, the Court also acknowledged that sometimes, "despite application of an erroneous Guidelines range, a reasonable probability of prejudice [may] not exist." *Id.* at 1346. This can occur when the record shows "that the district court thought the sentence it chose was appropriate irrespective of the Guidelines range" and explained its reasoning, which "could make it clear that the judge based the sentence he or she selected on factors independent of the Guidelines." *Id.* at 1346–47; *see United States v. Halverson*, 897 F.3d 645, 652 (5th Cir. 2018) (holding an incorrect guidelines range calculation to be harmless when the district court gave a significant downward variance based on the defendant's age and lack of criminal history); *cf. United States v. Tanksley*, 848 F.3d 347, 353 (5th Cir. 2017) (noting the district court's explanation for varying from an incorrect guidelines range discussed only the guidelines and so the court could not determine the sentence "had nothing to do with the [incorrect] Guidelines calculation").

The district court thoroughly explained the independent factors that led it to its sentencing decision, and specifically stated the sentence was made

15

without regard to the guidelines range. If there was any procedural error in determining the applicable range, it was harmless. McCardell does not challenge the substantive reasonableness of the sentence. Having found no procedural error, or, at most, harmless error, we affirm McCardell's sentence.

## CONCLUSION

For the foregoing reasons, we AFFIRM McCardell's conviction and sentence.