# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 24, 2022

Lyle W. Cayce
Clerk

———————

No. 20-40869

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Rodney Mesquias; Henry McInnis,

*Defendants—Appellants*.

———————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CR-8-1

———————

Before Jones, Haynes, and Costa, *Circuit Judges*.

Gregg Costa, *Circuit Judge*:

For close to a decade, Rodney Mesquias and Henry McInnis ran a network of home health and hospice centers in Texas. A federal grand jury alleged that Mesquias and McInnis, along with others not parties to this appeal, engaged in a scheme to falsely certify that patients were eligible for home health or hospice services. The indictment charged them with six counts of health care fraud and one count each of conspiracy to commit health care fraud, conspiracy to launder money, and conspiracy to obstruct justice. Mesquias faced an additional charge—conspiracy to pay kickbacks. After a twelve-day trial, a jury convicted Mesquias and McInnis on all counts.

No. 20-40869

The district court sentenced them to prison terms of twenty and fifteen years respectively. We consider whether: (1) sufficient evidence supports the fraud convictions and (2) the district court properly calculated loss when sentencing defendants.

I

Defendants challenge the sufficiency of the evidence to support their convictions for health care fraud and conspiracy to commit that fraud.[1] Our sufficiency review is highly deferential to the jury's verdict. We will reverse only if no rational jury could have found defendants guilty beyond a reasonable doubt. *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016). As a result, the recounting of the evidence that follows is in the light most favorable to the jury's verdict. *United States v. Moreno-Gonzales*, 662 F.3d 369, 372 (5th Cir. 2011).

A

Medicare, the multibillion dollar federal health care program, reimburses certain home health and hospice treatments. Home health care includes nursing and therapy for patients who, owing to their medical problems, find it difficult to leave their home without assistance. Hospice is holistic end-of-life care for patients who are dying. It is palliative—focused on making the patient comfortable in their dying days—rather than curative.

A web of statutes and regulations governs whether Medicare will pay for these services. Medicare covers home health services when a doctor

---

[1] Defendants' opening briefs challenge only the substantive health care fraud convictions. McInnis's reply brief belatedly tries to challenge the convictions for conspiracy to commit health care fraud, arguing that they are "predicated on the same purported fraud" as the substantive fraud counts. Even if we were to consider McInnis's argument, however, the evidence supporting the substantive counts would be more than sufficient to support the conspiracy counts.

No. 20-40869

certifies that the patient is confined at home and needs skilled nursing or therapy. 42 U.S.C. § 1395f(a)(2)(C). Hospice care is reimbursed when both the patient's primary-care physician and the medical director of the hospice certify that the patient has a life expectancy of six months or less. *Id.* §§ 1395f(a)(7), 1395x(dd)(3)(A). The hospice certification lasts ninety days, *id.* § 1395f(a)(7), but Medicare acknowledges that estimating life expectancy is an inexact science and allows for periodic renewal of hospice lasting beyond six months upon recertification by either the primary-care physician or medical director. *See id.*; 79 Fed. Reg. 50452, 50470 (Aug. 22, 2014).

Given the millions of claims that it handles, Medicare cannot scrutinize every claim that comes through the door. So the front end of its reimbursement system is based on trust. If a provider submits a claim with all the information Medicare asks for—including the required certifications—Medicare pays the claim without verifying the accuracy of the underlying information. On the back end, after Medicare reimburses the providers, auditors review suspicious claims.

B

A person commits health care fraud by "knowingly and willfully execut[ing] a scheme to defraud a government health care program like Medicare." *United States v. Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017) (citing 18 U.S.C. § 1347). A person is guilty of conspiring to commit health care fraud when he knowingly agrees to execute the fraud scheme with the intent to further its unlawful purpose. *United States v. Njoku*, 737 F.3d 55, 63 (5th Cir. 2013) (citing 18 U.S.C. § 1349).

Overwhelming evidence established that Mesquias and McInnis committed health care fraud by abusing Medicare's reimburse-first-verify-later system from 2009 to 2018. That evidence, sampled below, is more than sufficient to support the guilty verdicts.

Through their respective positions as owner-president and CEO of the Merida Group—the umbrella company for several businesses purportedly offering home health and hospice care—Mesquias and McInnis orchestrated a scheme of certifying patients for home health and hospice care regardless of their eligibility. They certified all patients who came to their facilities, regardless of eligibility. After the patients were certified once, defendants recertified them indefinitely, again without consideration of their eligibility. An estimated 70 to 85 percent of the Merida Group's patients were ineligible for the care they received.

A few examples show that many certifications were not borderline cases. One hospice patient had a regular job at Walmart, even though having employment disqualifies patients from hospice. Another, who supposedly had terminal-level dementia, recounted to his nurse a days-old memory of twisting his knee while dancing the Macarena at a family celebration. And one home health patient was actually a boxing instructor at a local gym; he was spotted drinking a beer while driving when he was supposed to be stuck at home with a disability.

To facilitate the fraudulent certification, Mesquias and McInnis built a roster of compliant in-house medical directors at Merida Group. The medical directors routinely lied about having seen patients face-to-face as Medicare requires, exaggerated how sick the patients were and made up diagnoses so that the patients would appear eligible for hospice, and fabricated medical records to cover their tracks. The directors also circumvented the patients' primary-care physicians and often referred patients to hospice at one of the Merida Group's entities over the objections of those physicians.

The carrot-and-stick approach defendants used to control the actors in their scheme reveals their fraudulent intent. The carrots were financial

incentives like raises and bonuses to participate in the fraud. The sticks were harsh. Defendants intimidated their employees into submission. When employees pushed back against his excesses, Mesquias warned them not to "f\*\*\* with his money." McInnis was the enforcer. He "cuss[ed] out" skeptical nurses and "yell[ed] at the staff" if patients were not certified. For those who failed to go along, consequences were severe. One medical director lost his job for refusing to refer patients to hospice. Other employees, like nurses, who raised questions were also fired or threatened with termination.

Taxpayers were not the only victims of defendants' scheme; patients suffered too. Defendants lied to patients and families about the eligibility requirements for home health and hospice care and roped them in by exaggerating potential benefits. They targeted poor and elderly non-English speakers in San Antonio housing projects and used the language barrier to trick them into signing up for hospice care. Defendants also told patients that they had terminal illnesses when they did not. Those lies took a psychological toll. To take an example, one patient who was told that she had less than six months to live began thinking about ending her life so that her family would not have to watch her die slowly. She lost her appetite, cried incessantly, confined herself at home because she did not want to burden her family, and stopped sleeping out of the fear that she would never wake up. Five years after the diagnosis telling her that she had six months to live, that patient testified at trial.

The scale of the scheme matched its cruelty. By the time they were caught, defendants had submitted over 47,000 claims for over 9000 patients. They billed over $152 million to Medicare and received $124 million.

To prove this fraud at trial, the government called nineteen witnesses—fourteen of whom were involved with Merida Group and three

No. 20-40869

of whom were also charged in the conspiracy[2]—who established the facts just discussed. This evidence, which is only a sampling, is more than enough to show an overall conspiracy and scheme to engage in health care fraud. Indeed, it is more damning evidence than that in other cases in which we have upheld health care fraud convictions. *See, e.g.*, *United States v. Veasey*, 843 F. App'x 555, 561–65 (5th Cir. 2021); *United States v. Ezukanma*, 756 F. App'x 360, 364–69 (5th Cir. 2018); *Sanjar*, 876 F.3d at 746; *United States v. Barson*, 845 F.3d 159, 163–65 (5th Cir. 2016); *United States v. Willett*, 751 F.3d 335, 340–43 (5th Cir. 2014).

C

Defendants do not address most of this evidence. Instead, they advance two arguments in the effort to overturn their convictions. First, they assert that the government offered no proof that they knew the patients were ineligible for home health and hospice. Mesquias argues that he could not have had the requisite intent to defraud because the government offered no evidence that he played a role in the false certifications. McInnis separately portrays himself as an innocent office worker with no power to question the certifications.

The evidence belies their claims of ignorance. Mesquias was the driving force behind the false certifications and doctored medical records. He established the rule of admitting every patient and not discharging them. He ordered that medical directors spend multiple days creating "boxes" of falsified medical records. McInnis enforced Mesquias's rules. He ran the day-to-day operations of the organization from its "nerve center" in

---

[2] The government charged four others: an administrator named Jose Garza and three medical directors, Jesus Virlar, Eduardo Carrillo, and Francisco Pena. Garza, Virlar, and Carillo pleaded guilty and testified at trial. Pena faced trial with Mesquias and McInnis and was convicted on all counts but died before sentencing.

Harlingen, issuing directives on how to circumvent objecting physicians, falsify medical records, dupe auditors, and lie to patients. And he aggressively confronted employees who questioned the scheme. Unlike cases in which we have found insufficient evidence to support health care fraud convictions, *see United States v. Nora*, 988 F.3d 823, 833–34 (5th Cir. 2021) (reversing an officer manager's conviction because he did not know that his work was unlawful); *United States v. Ganji*, 880 F.3d 760, 773–78 (5th Cir. 2018) (reversing doctors' convictions because the government offered no proof that they were involved in the fraud scheme), Mesquias and McInnis were intimately involved with the fraud. *See Sanjar*, 876 F.3d at 746 (affirming the convictions of two doctors who orchestrated a fraud scheme).

Second, defendants argue that the government did not prove the ineligibility of the six patients whose claims were listed as the substantive fraud counts. Again, the record tells a different story. Merida Group medical directors testified that the certifications for all six patients were either outright lies or based on fabricated medical records. Such testimony of a co-conspirator, as long as it is not incredible, is alone sufficient to support a conviction. *United States v. McClaren*, 13 F.4th 386, 399 (5th Cir. 2021) (explaining that such testimony is incredible only if it defies the laws of nature or involves matters the witness could not have observed). Although corroboration of these damaging admissions was not required for the jury to convict, ample circumstantial evidence backed up the co-conspirators' testimony. The named patients were in hospice for an average of three years, a far cry from Medicare's six-months-to-live eligibility requirement.[3] Some

---

[3] As we have noted, Medicare allows for recertification beyond six months because medical predictions are not always accurate. Still, the length of the lives at issue support the co-conspirators' testimony.

patients were alive when they were discharged; one even testified at trial five years after being certified.

Defendants also point us to a pair of cases—one from a different circuit, one from a district court, both involving the civil False Claims Act—declining to find that certain claims submitted to Medicare were fraudulent. *See United States v. AseraCare, Inc.*, 938 F.3d 1278, 1285 (11th Cir. 2019); *United States ex rel. Wall v. Vista Hospice Care, Inc.*, 2016 WL 3449833, at *19 (N.D. Tex. June 20, 2016). But in those cases, there was no evidence of fraud beyond (1) after-the-fact expert testimony that the initial determinations of hospice eligibility were inaccurate, and (2) unrelated anecdotes of lax business practices. *AseraCare*, 938 F.3d at 1285; *Wall*, 2016 WL 3449833, at *19. Both cases recognized that stronger evidence, like facts inconsistent with doctors' proper exercise of their clinical judgment, could change the outcome. *See AseraCare*, 938 F.3d at 1297; *Wall*, 2016 WL 3449833, at *17. That stronger evidence—of lies, kickbacks, and fabrication—is present here.

From *AseraCare* and *Wall*, defendants derive an "objective falsity" theory. Under this theory, clinical judgments, like the ones underlying hospice and home health certifications, cannot be the basis of a fraud prosecution unless the government offers expert testimony to prove them objectively false. But health care providers cannot immunize themselves from prosecution by cloaking fraud with a doctor's note. *See United States v. Veasey*, 843 F. App'x 555, 561–62 (5th Cir. 2021) (rejecting the argument that a factual determination that a patient is "homebound" is a medical opinion that cannot establish intent to commit fraud). Categorical evidentiary requirements are at odds with a jury's ability to consider a broad array of direct and circumstantial evidence. *See Sanjar*, 876 F.3d at 745 (rejecting a categorical rule requiring expert testimony in health care fraud cases); *see also* Fifth Circuit Pattern Jury Instructions (Criminal) 1.07 (2015) ("The law makes no distinction between the weight to be given either

No. 20-40869

direct or circumstantial evidence."). What is more compelling: a doctor's testimony that he lied when certifying a patient or an expert's testimony that he would have made a different clinical determination than the certifying doctor? Common sense suggests the former, which is in abundance here.

Defendants' arguments do not show that the jury lacked evidence to find them guilty. We therefore affirm their convictions.

II

That brings us to sentencing. The district court found that defendants' fraud was pervasive and thus treated the entire amount that they billed to Medicare as the intended loss. That enhanced their offense levels by 24 points, resulting in an advisory Sentencing Guidelines range of life in prison. U.S.S.G. § 2B1.1. The district court then sentenced Mesquias to 240 months and McInnis to 180 months.

Before imposing those sentences, the district court rejected the defense's request for testimony at the sentencing hearing. We are troubled by that refusal. The momentousness of any sentencing, combined with the complexity of this $100 million-plus fraud scheme, would seem to have warranted allowing testimony absent some compelling reason to the contrary. But defendants' briefs do not raise the denial of testimony as reason to remand or vacate their convictions. Nor did defendants specify in district court the testimony that they planned to elicit.

We thus turn to the argument that defendants do raise: that the court erred in calculating loss. In defendants' view, because the government did not prove that the fraud was pervasive, the district court should have limited the intended loss to the roughly $20,000 billed for the six patients associated with the substantive health care fraud counts.

The government ordinarily has the burden to prove loss at sentencing. *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012). But when fraud is pervasive—that is, when it becomes impractical to separate legitimate claims from fraudulent ones—the burden shifts to the defendant to show legitimate instances of billing. *Id.* If a district court finds pervasive fraud, it can then use the entire amount billed to Medicare as intended loss. *See United States v. Barnes*, 979 F.3d 283, 309, 312 (5th Cir. 2020). That crucial finding of pervasive fraud is reviewed for clear error. *Id.* at 312.

The same evidence that supported defendants' convictions also allowed the district court to find that the fraud was pervasive. Defendants' fraud seeped through every nook of their operation. According to former Merida Group medical directors, none of the organization's medical records were trustworthy. Nurses echoed the medical directors, testifying that 70 to 85 percent of their patients were ineligible for hospice. Given this comprehensive fraud, the district court was not required to sift through thousands of claims of dubious reliability to sort the fraudulent from the nonfraudulent. We have upheld pervasive fraud findings on less. *See United States v. Mazkouri*, 945 F.3d 293, 304 (5th Cir. 2019) (finding pervasive fraud when defendant provided unnecessary services over six years); *Ezukanma*, 756 F. App'x at 373 (finding pervasive fraud of overbilling in case involving over 90,000 claims); *United States v. Dubor*, 821 F. App'x 327, 329 (5th Cir. 2020) (finding pervasive fraud of kickbacks over five years). And defendants identified no legitimate billings to reduce the loss amount.

\* \* \*

The convictions and sentences are AFFIRMED.