# United States Court of Appeals
# for the Fifth Circuit

No. 23-60086

United States Court of Appeals
Fifth Circuit

**FILED**

August 9, 2024

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellee*,

*versus*

Scott E. Nelson,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 4:17-CR-131-1

_____

Before Clement, Engelhardt, and Wilson, *Circuit Judges*.

Per Curiam:*

A jury convicted Dr. Scott E. Nelson of one count of conspiracy to commit healthcare fraud in violation of 18 U.S.C. §§ 1347, 1349, and seven individual counts of healthcare fraud in violation of § 1347. The district court sentenced Nelson to 60 months' imprisonment and ordered him to pay $15,453,316.57 in restitution. Nelson appeals both his conviction and sentence. We affirm.

_____

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-60086

## I.

## A.

In 2005, Dr. Nelson opened a family medicine practice in Cleveland, Mississippi. That same year, he began acting as medical director for multiple hospice care providers throughout the Mississippi Delta. Typically, hospice care is indicated for patients who are terminally ill, meaning they have a life expectancy of six months or less based on their prognosis. Once a patient has been certified by a physician as hospice eligible, the hospice provider can submit billing claims to Medicare for necessary expenses. In his role as medical director, Nelson was expected to evaluate patients and determine whether they qualified for hospice care.

In 2006 or 2007, the Mississippi Attorney General's Office and the United States Department of Health and Human Services received information that several hospice providers in the Delta were enrolling patients in hospice care though they were not terminally ill. By 2013, the agencies were investigating multiple hospice providers and medical professionals for healthcare fraud. During their joint investigation, the agencies determined that Nelson was the "common denominator" for all these hospice providers.

According to testimony presented at trial, Nelson would certify patients for hospice in two ways. Sometimes, hospice employees would go door-to-door recruiting patients and deliver them to Nelson in transport vans. Nelson would then examine the patients to determine if they qualified for hospice care. Other times, a nurse practitioner would examine patients and recommend hospice care, and Nelson would certify the patients based on that recommendation without ever seeing the patients.

Regardless of how the initial examination occurred, it was "very rare" for Nelson not to admit a patient to hospice care. And though these patients

were purportedly six months or less from dying, very few of them actually died. More troubling, many of these patients did not even know they were on hospice. Nevertheless, the hospice providers billed Medicare over sixteen million dollars for services related to Nelson's diagnoses, and Nelson received $442,704.68 in his role as medical director of those hospice providers.

## B.

In November 2017, the Government charged Nelson with one count of conspiracy to commit healthcare fraud in violation of 18 U.S.C. §§ 1347, 1349 (Count 1) and twelve counts of healthcare fraud related to individual patients in violation of § 1347 (Counts 2–13). The Government dismissed Count 11 before trial and prosecuted the remaining charges during a two-week jury trial. The jury found Nelson guilty of conspiracy (Count 1) and reached a split decision on the individual counts, finding him guilty on Counts 2, 3, 4, 5, 7, 8, and 10. Nelson moved for a judgment of acquittal or, in the alternative, a new trial, but the district court denied his motion.

During trial, the Government introduced evidence that the hospice providers billed Medicare $16,596,186.57 for the patients Nelson referred to them. The Presentence Investigation Report (PSR) recommended that number as the loss amount for Nelson's crimes for sentencing purposes, and the district court adopted the PSR's recommendation over Nelson's objections. In addition to finding that the loss amount constituted the actual loss attributable to Nelson's crimes, the district court alternatively held that Nelson's fraud was pervasive, such that the loss amount represented the intended loss of his crimes as well. After giving Nelson credit for $1,481,614 that Medicare had already recovered, the district court ordered Nelson to pay restitution of $15,453,316.57.

In addition to ordering restitution, the district court sentenced Nelson to 60 months' imprisonment, below the proposed guideline range of 108 to 135 months. Nelson timely appealed his convictions and his sentence.

## II.

"Where, as here, a defendant has timely moved for a judgment of acquittal, this court reviews challenges to the sufficiency of the evidence *de novo*." *United States v. Nicholson*, 961 F.3d 328, 338 (5th Cir. 2020) (citing *United States v. Perez-Ceballos*, 907 F.3d 863, 866–67 (5th Cir. 2018)). "Though *de novo*, this review is nevertheless highly deferential to the verdict." *Id.* (quoting *United States v. Tinghui Xie*, 942 F.3d 228, 234 (5th Cir. 2019)). We will affirm a jury's verdict "unless, viewing the evidence and reasonable inferences in [the] light most favorable to the verdict, no rational jury 'could have found the essential elements of the offense to be satisfied beyond a reasonable doubt.'" *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) (quoting *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016)). "In other words, 'our question is whether the jury's verdict was reasonable, not whether we believe it to be correct.'" *United States v. Meyer*, 63 F.4th 1024, 1035 (5th Cir. 2023) (alterations accepted) (quoting *United States v. Bolton*, 908 F.3d 75, 89 (5th Cir. 2018)). This deferential review applies to "all evidence, whether circumstantial or direct." *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009).

This court reviews a district court's decision to deny a motion for a new trial for clear abuse of discretion. *Meyer*, 63 F.4th at 1039. "[W]hile the district court . . . may assess the credibility of witnesses in ruling on a motion for a new trial, '[i]n our capacity as an appellate court, we must not revisit evidence, reevaluate witness credibility, or attempt to reconcile seemingly contradictory evidence.'" *Id.* at 1039–40 (second alteration in original) (quoting *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005)).

Generally, at sentencing, a district court's "calculation of the amount of loss is a factual finding reviewed for clear error." *United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012). But a challenge to the *method* used to calculate loss, insofar as it relates to the application of the Sentencing Guidelines, is reviewed *de novo*. *United States v. Harris*, 597 F.3d 242, 250–51 (5th Cir. 2010). This distinction can be hard to draw. *See id.* "Nonetheless, the guidelines emphasize the deference that must be shown to the sentencing judge, who is in a unique position to assess the applicable loss, so this court need only determine whether the district court made 'a reasonable estimate of the loss.'" *Hebron*, 684 F.3d at 560 (quoting U.S.S.G. § 2B1.1 cmt. 3(C)). "A district court's fact-finding as to the amount of restitution . . . is reviewed for clear error." *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006).

## III.

Nelson advances three principal issues on appeal. He contends that (A) there is not sufficient evidence to support his conspiracy conviction; (B) there is insufficient evidence to support his convictions for specific charged instances of healthcare fraud; and (C) the district court miscalculated the loss amount of his crimes for purposes of sentencing and restitution. We address each contention in turn.

## A.

To convict a defendant of conspiracy to commit health care fraud, the Government must prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit health care fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose. 18 U.S.C. §§ 1347, 1349; *United States v. Delgado*, 668 F.3d 219, 226 (5th Cir. 2012). "Direct evidence of a conspiracy is unnecessary; each

element may be inferred from circumstantial evidence." *Delgado*, 668 F.3d at 226 (quoting *United States v. Garza-Robles*, 627 F.3d 161, 168 (5th Cir. 2010)). Still, "[p]roof of an agreement to enter into a conspiracy is not to be lightly inferred." *United States v. Johnson*, 439 F.2d 885, 888 (5th Cir. 1971). "One cannot negligently enter into a conspiracy," *Ganji*, 880 F.3d at 776, and "[m]ere association with conspirators is not enough to establish participation in a conspiracy," *United States v. Fitzharris*, 633 F.2d 416, 423 (5th Cir. 1980).

At trial, the Government produced evidence that Nelson was the medical director for the hospice providers involved in the Medicare fraud scheme, and that he was the "common denominator" linking the otherwise unconnected organizations. The Government also introduced evidence that employees of those hospice providers would go door-to-door to solicit new hospice patients and transport those patients to Nelson's office for him to certify them as hospice eligible, even though Nelson was rarely their usual doctor. Other times, Nelson would certify patients for hospice without ever seeing them in person, instead relying upon information compiled by a nurse practitioner.

Regardless of how the initial examination occurred, it was "very rare" for Nelson not to certify these prospective patients as hospice eligible. It was also "very, very rare" for one of the hospice-certified patients to die while in hospice care. In fact, one witness testified that out of eighty patients under the care of her provider, only two or three died over the course of the scheme. Moreover, several of the patients that Nelson certified as having less than six months to live were still alive and able to testify at trial *ten years later*. Several of the witnesses testified that Nelson never told them that they were being placed on hospice. Based on this evidence, the jury concluded that Nelson conspired with the hospice providers to defraud Medicare.

Nelson argues that this court must overturn the jury's verdict "[b]ecause the Government failed to produce any evidence . . . that Dr. Nelson" agreed to commit health care fraud or knew of the hospice providers' fraudulent conduct.   Though Nelson is correct that the Government provided no *direct* evidence of a conspiratorial agreement or his culpable *mens rea*, the Government proffered substantial *circumstantial* evidence, as detailed above.  That circumstantial evidence is enough.  *See Delgado*, 668 F.3d at 226.  Further, the district court appropriately instructed the jury that "proof of an agreement to enter into a conspiracy is not to be lightly inferred," and "the mere fact that certain persons may have associated with each other . . . does not necessarily establish proof of the existence of a conspiracy."  *See Johnson*, 439 F.2d at 888; *Fitzharris*, 633 F.2d at 423.  We assume that the jurors followed the district court's instructions.  *See Jones v. United States*, 527 U.S. 373, 394 (1999).  And given the evidence adduced at trial, we cannot say that "no rational jury could have found the essential elements of the offense to be satisfied beyond a reasonable doubt." *Ganji*, 880 F.3d at 767 (internal quotations omitted).[1]   Accordingly, we decline to disturb Nelson's conspiracy conviction.

## B.

Nelson similarly contends that there was insufficient evidence to convict him of seven of eleven charged individual counts of healthcare fraud.

---

[1] Nelson references *Ganji* to support that there was insufficient evidence to convict him of conspiracy to commit healthcare fraud.  *See* 880 F.3d at 776.  In that case, a jury inferred Dr. Ganji's guilt from circumstantial evidence, and this court overturned her conviction.  *Id.* at 778.  But in *Ganji*, the alleged co-conspirators testified that they did not even know Ganji, much less conspire with her to commit healthcare fraud.  *See id.* at 770. Contrarily, multiple hospice owners testified in this case to dealing with Nelson directly. *Ganji* is thus distinguishable.

Under 18 U.S.C. § 1347(a), a person is guilty of healthcare fraud if he or she "knowingly and willfully execute[s] 'a scheme or artifice—(1) to defraud any healthcare benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises,' any healthcare benefit program's money in connection with the delivery of or payment for healthcare services." *Ganji*, 880 F.3d at 777 (quoting 18 U.S.C. § 1347(a)). "A representation is 'false' if it is known to be untrue or is made with reckless indifference as to its truth or falsity." Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.59 (2019).

And as the district court properly instructed the jurors at trial, a jury "may find that a defendant had knowledge of a fact if [it] find[s] that the defendant deliberately closed his eyes to what would otherwise have been obvious to him." *Id.* § 1.42. "While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact." *Id.*; *see also Delgado*, 668 F.3d at 227–28 (upholding pattern deliberate indifference instruction in the healthcare fraud context).

Mindful of these standards, "each substantive count require[d] the [G]overnment prove the submission or attempted submission of a separate fraudulent claim." *United States v. Martinez*, 921 F.3d 452, 472 (5th Cir. 2019). Nelson asserts that the Government failed to meet its burden because it did not provide direct evidence that Nelson knew his patients were not terminally ill—and thus did not qualify for hospice care—at the time he certified them for hospice care. We disagree.

Of the seven individual patients for whom Nelson was convicted of defrauding Medicare, he personally examined four of them. Three of those patients testified at trial that they were not terminally ill at the time Nelson

examined them.  They also testified that no one ever told them they were placed on hospice, and they never believed they needed to be on hospice.  A caretaker for the fourth patient testified that the patient was not especially sick and still largely took care of himself at the time of trial.  The caretaker also testified that she only learned the patient was on hospice when the patient started receiving bills from the hospice provider.

Nelson electronically certified the other three patients for hospice care without examining them.  The first patient testified that at the time Nelson certified her in 2012, she was taking care of young twin boys.  And though she was sick in 2012, she was not bedridden.  The second patient testified that she was not terminally ill when Nelson certified her.  In fact, another doctor who treated that patient at the time testified that the patient was "alert," "talkative," and not in "any type of distress that would make [the doctor] feel that [the patient] needed to be some other place other than [at the doctor's] office at that time."  Finally, the third patient testified that he was actively working as a bricklayer when Nelson certified him for hospice.  All three patients testified that they never knew they were on hospice, and they never believed they needed to be.

In addition to these details, it is telling that the jurors saw six of these seven patients come into court and take the stand in person.  Nelson certified each patient for hospice eligibility between 2012 and 2014.  Thus, when they testified in 2022, it had been nearly a decade since they received a terminal diagnosis.  In other words, the fact that the patients were still alive and healthy enough to testify is itself circumstantial evidence that supports Nelson's convictions on the individual counts.  *See United States v. Mesquias*, 29 F.4th 276, 282 (5th Cir. 2022) (recognizing the fact that a hospice patient "testified at trial five years after being certified" was circumstantial evidence that supported a healthcare fraud conviction).

Given the testimony and other evidence at trial, we cannot say that "no rational jury could have found the essential elements of [each substantive count] to be satisfied beyond a reasonable doubt." *Ganji*, 880 F.3d at 767. The Government thus proffered sufficient evidence for the jury to conclude that Nelson knowingly engaged in healthcare fraud or, at the very least, "deliberately closed his eyes to what [should] otherwise have been obvious to him." Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 1.42. We therefore uphold Nelson's convictions as to each individual count of healthcare fraud.[2]

## C.

Finally, Nelson asserts that the district court miscalculated the loss amount of his crimes for purposes of sentencing[3] and restitution. We start with the court's sentencing calculation.

The commentary to the Sentencing Guidelines provides that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A). The Government typically bears the burden of proving the loss amount. *Hebron*, 684 F.3d at 563. But "where the [G]overnment has shown that the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate." *Id.* Should the defendant fail to make such a showing, "the district court may reasonably treat the

---

[2] Even though Nelson sought both a judgment of acquittal and a new trial in the district court, his appellate arguments are framed solely through the lens of acquittal. To the extent that Nelson's request for a new trial is preserved, it offers him no avenue for relief for the same reasons discussed above the line regarding sufficiency of the evidence.

[3] The calculation of the loss amount matters for sentencing because it affects Nelson's total offense level. If the district court erred in calculating the loss amount resulting from Nelson's crimes, then resentencing could be warranted based on his new offense level.

entire claim for benefits as intended loss." *Id.* The factual determination of pervasiveness is reviewed for clear error. *United States v. Barnes*, 979 F.3d 283, 312 (5th Cir. 2020).

At sentencing, the Government introduced evidence that Nelson was the referring physician for over 7,000 hospice claims that yielded over sixteen million dollars from Medicare. Agent Mike Loggins, one of the special agents who handled Nelson's case, testified that those figures were drawn from "thousands and thousands of medical records" that demonstrated a consistent pattern of fraud. For example, the Government provided evidence that the hospice providers were systematically keeping patients on hospice for too long, Nelson "signed off" on every patient brought to him for hospice certification, and the providers for which he served as medical director had the highest live patient discharge rates in Mississippi at the time of the fraud. Based on that evidence, the district court concluded that Nelson's fraud was pervasive.

That finding is supported not only by the trial record in this case but by this court's precedent. For example, in *Mesquias*, this court affirmed the district court's finding of pervasiveness in a similar Medicare fraud case where the fraud "seeped through every nook of [the provider's] operation," and 70 to 85 percent of the patients were ineligible for hospice care. 29 F.4th at 283. Our court stated that "[g]iven th[e] comprehensive fraud, the district court was not required to sift through thousands of claims of dubious reliability to sort the fraudulent from the nonfraudulent." *Id.* The same is true in this case. Indeed, "[w]e have upheld pervasive fraud findings on

less." *See id.* (citing cases). Accordingly, we affirm the district court's loss calculation for purposes of Nelson's sentencing.[4]

Unlike the loss amount for sentencing, which allows consideration of intended loss, restitution is limited to the victim's actual loss. *United States v. Sharma*, 703 F.3d 318, 322–23 (5th Cir. 2012). The district court determined that $16,596,186.57 was the actual loss inflicted by Nelson's fraud. As discussed above, that number was based on robust evidence presented during trial and at sentencing. Moreover, the district court carefully parsed the evidence and deducted money that could not reliably be attributed to Nelson to reach a final restitution amount of $15,454,316.57.[5]

_____

[4] Nelson attempts to rebut the $16,596,186.57 amount of loss by relying on his expert witness, Wendy Gore. She proposed $935,696 as an alternate amount of loss attributable to Nelson. But there were multiple reasons for the district court to discount Gore's number. First, it is not clear how she narrowed over 600 records to thirty that "accurately" related to Nelson. Second, though she testified that the Government's evidence contained "many, many errors in math," her own aggregated figures were far from conclusive. Accordingly, the district court did not err by discounting her testimony. *See Burton v. United States*, 237 F.3d 490, 500 (5th Cir. 2000) ("A district court has wide discretion in determining which evidence to consider and to credit for sentencing purposes.").

[5] Whether the district court improperly included loss amounts for the four patients for which Nelson was acquitted was discussed at oral argument. But even if that issue had been properly raised by Nelson in his briefing, it would not make a difference. "A defendant sentenced under the Mandatory Victim Restitution Act," like Nelson, "is only responsible for paying restitution for the conduct underlying the offense for which he was convicted." *United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005); *see also United States v. Mason*, 722 F.3d 691, 693 (5th Cir. 2013) (same). However, "where a fraudulent scheme is an element of the conviction," as it is here, "the court may award restitution for 'actions pursuant to that scheme.'" *United States v. Cothran*, 302 F.3d 279, 289 (5th Cir. 2002) (quoting *United States v. Stouffer*, 986 F.2d 916, 928 (5th Cir. 1993)). "[T]he restitution for the underlying scheme to defraud is limited to the *specific* temporal scope of the indictment." *Inman*, 411 F.3d at 595. Count 1 of the indictment, for which Nelson was convicted, includes a temporal scope of January 1, 2005, to June 8, 2015. This timeframe includes the dates associated with the acquitted counts of healthcare fraud. Thus, the losses associated with the counts for which Nelson was acquitted do not fall outside the

No. 23-60086

That measured decision is not clearly erroneous.[6] We therefore uphold the district court's restitution award.

## IV.

For the foregoing reasons, we AFFIRM Dr. Nelson's conviction for conspiracy to commit healthcare fraud as well as his convictions for seven individual counts of healthcare fraud. We also AFFIRM the district court's calculation of the loss amount attributed to Nelson's offenses for purposes of sentencing and restitution.

---

specific temporal scope of the indictment, and it was not plain error for the district court to include those losses in the award of restitution. *See Stouffer*, 986 F.2d at 928–29.

[6] This is true despite Gore's expert testimony. While this court's review of restitution is never a rubber stamp, *see, e.g.*, *Sharma*, 703 F.3d at 324, the mere existence of contrary evidence does not necessarily invalidate a district court's restitution determination, *Barnes*, 979 F.3d at 313–14 (affirming restitution award despite contrary expert report). For the reasons already discussed, the district court did not err by accepting the Government's calculations and rejecting Gore's. *See supra* note 4.