# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 12, 2025

Lyle W. Cayce
Clerk

No. 24-30431

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

KRISTAL GLOVER-WING,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:21-CR-312-1

Before WIENER, ENGELHARDT, and OLDHAM, *Circuit Judges*.
JACQUES L. WIENER, JR., *Circuit Judge*:

This case is a direct appeal of Defendant-Appellant Kristal Glover-Wing's criminal convictions of conspiracy and healthcare fraud involving the hospice care reimbursement benefit available through Medicare. We review her preserved claims that (1) challenge the sufficiency of the evidence underlying her convictions, and (2) assert that the district court erred in declining to judicially estop the government from pursuing its conspiracy charge. For the reasons discussed herein, we AFFIRM the district court's judgment.

No. 24-30431

## I.

### *A. Factual Background*

In 1999, Glover-Wing received certification as a Medicare[1] provider and founded Angel Care Hospice ("ACH") to serve various cities throughout Louisiana. Seeking local physicians to serve as ACH's medical directors, she recruited Drs. Gary Wiltz and Charles Louis who served in that role from 2006 to 2014 and from 2016 to 2017, respectively. During their tenures, Drs. Wiltz and Louis referred patients with chronic medical conditions from their respective clinics to ACH for hospice care. They also signed certifications attesting to these patients' terminal illnesses. These certifications, however, contradicted the generally active and capable lives that the patients were living.[2]

---

[1] Medicare is a program that provides federally funded health insurance to eligible Americans who are sixty-five years old and older. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506 (1994); *see generally Parts of Medicare*, MEDICARE, https://www.medicare.gov/basics/get-started-with-medicare/medicare-basics/parts-of-medicare (last visited Sept. 30, 2025). Under Medicare Part A, eligible patients may elect to receive coverage for hospice care. *United States v. Mesquias*, 29 F.4th 276, 279 (5th Cir. 2022) (citing 42 U.S.C. § 1395f(a)(2)(C)). To be eligible for hospice care reimbursement, a patient's primary care physician and the medical director of the hospice must both certify that a patient is "terminally ill," defined as a prognosis with a life expectancy of six months or less. *Id.* (citing 42 U.S.C. §§ 1395f(a)(7), 1395x(dd)(3)(A)); 42 C.F.R. § 418.3. When patients are certified as terminally ill and elect hospice care reimbursement, they also surrender their rights to receive Medicare coverage for curative care. While an initial certification lasts only ninety days, Medicare permits periodically renewing a certification. *Mesquias*, 29 F.4th at 279 (first citing 42 U.S.C. § 1395f(a)(7); and then citing 79 Fed. Reg. 50452, 50470 (Aug. 22, 2014)).

[2] The investigation into ACH and Glover-Wing focused on twenty-four patients who all had received—but none of whom had needed—hospice care services, resulting in a total sum reimbursed to ACH of $1,545,817.57. The investigation also revealed that ACH was providing free services to Glover-Wing's mother.

No. 24-30431

ACH's strategy—its recruitment of medical directors and instructions to ACH's nurses and administrative staff for managing patients—served as the basis for Glover-Wing's one count of conspiracy to commit healthcare fraud pursuant to 18 U.S.C. § 1349. As illustrated with Drs. Wiltz and Louis, Glover-Wing sought physicians to serve as medical directors who would, after certifying as terminally ill, direct patients to ACH's hospice care services, and who would receive compensation in return. Physicians who assumed the role but refused to insist that their patients use ACH as their exclusive hospice care provider, or otherwise disagreed with the ethics of ACH's practices, either resigned or were fired.

In supervising staff nurses, Glover-Wing instructed them to "chart the patient like on their worst day" and to "capture the worst because it is hospice." At trial, one nurse testified that Glover-Wing refused to discharge a patient, despite having hospital records that demonstrated no cancer after treatment, because Glover-Wing reasoned "the cancer could return." That same nurse testified that Glover-Wing would discharge hospice patients who required treatment at the hospital to avoid financial responsibility for their curative care, then would readmit them to ACH's hospice care after their discharge from the hospital. Others testified to this scheme by addressing Glover-Wing's practice of sending nurses to the homes of patients who were recently discharged from the hospital to reenroll them in ACH's care. One nurse also noted an instance when Glover-Wing instructed her to backdate a patient's readmission to hospice to the date of her release from the hospital, effectively falsifying the patient's chart notes. Administrative staff testified to similar ethical concerns under Glover-Wing's supervision. One employee attested to filing a complaint with the Department of Health and Human Services regarding ACH's practice of enrolling patients in hospice care, and noted high turnover, giving practitioners fears of jeopardizing their professional licenses.

3

No. 24-30431

Three patients who had suffered various maladies and received ACH's hospice care served as the foundation for Glover-Wing's three counts of healthcare fraud pursuant to 18 U.S.C. § 1347. Consistent in each case was someone disagreeing with ACH's decision to certify the patient as terminally ill. The first patient, Ms. Alexander, suffered from lupus. After Dr. Wiltz certified that Alexander was terminally ill, she received ACH's hospice services from February 2016 until January 2017. Contrary to the certification, two physicians who had treated Alexander for that condition noted that her prescribed medications were already controlling and improving her symptoms. A second patient, Ms. Arsement, suffered from— among a host of other illnesses and symptoms—lumbar spinal stenosis affecting her lower back. Dr. Wiltz certified Arsement as terminally ill, and she received hospice care services from July 2016 until June 2017. Her treating physician disagreed with the certification because she had deemed Arsement's condition treatable with medication. A third patient, Ms. Cooper, suffered from chronic obstructive pulmonary disease and received hospice care from August 2016 until February 2017, after being certified as terminally ill by Dr. Louis. Noting Cooper's ability to care for herself, Cooper's son did not find hospice care necessary. For those patients, Glover-Wing submitted reimbursement claims for $46,762.24, $43.281.18, and $22,358.77 respectively.

## B. Procedural Background

After a whistleblower complaint and an investigation into Glover-Wing and ACH, a federal grand jury indicted Glover-Wing and Drs. Wiltz and Louis for conspiracy to commit healthcare fraud under 18 U.S.C. § 1349, and for three counts of healthcare fraud under 18 U.S.C. § 1347.

During deliberations at a March 2023 trial, the jury submitted a note to the district court asking if the conspiracy count was limited to Glover-

Wing and her codefendants, or if it could also include Glover-Wing's employees. The parties subsequently disputed whether the jury instructions for the conspiracy charge should be limited to only the named defendants. Glover-Wing objected to leaving the jury instructions unmodified and requested that the government be judicially estopped from asking the jury to find Glover-Wing guilty of conspiracy involving any persons other than her codefendants, based on its prior representations that no unindicted coconspirators were present in the case.

After calling for a recess to review the record, the district court determined that, although the government's alleged representation was unrecorded, notes and comments in the record indicated that the government had confined this representation to a discussion of admitting hearsay evidence under the coconspirator exception of the Federal Rules of Evidence. That court noted that the language in the indictment clearly stated that "conspiracy is not limited to the defendants." When the district court inquired into any possible prejudice to Glover-Wing, she claimed that she had forfeited mounting a defense against the theory of a conspiratorial agreement with employees in reliance on the government's representation that there were no unindicted coconspirators—in other words, that any employee testifying at trial would not be considered a coconspirator. The district court overruled Glover-Wing's objection, denied her request to judicially estop the government from advancing this theory, and directed the jury to reread the instructions as originally given. The jury found Glover-Wing guilty of three counts of healthcare fraud and one count of conspiracy to commit healthcare fraud, but it fully acquitted Drs. Wiltz and Louis.

Glover-Wing moved for judgment of acquittal on all counts at trial. Having preserved her arguments, she renewed her insufficient-evidence claim in a post-verdict motion for judgment of acquittal, and renewed her judicial estoppel claim in a post-verdict motion for a new trial. After

considering both claims, the district court denied both of her motions. On appeal, Glover-Wing asserts that the district court erred in denying (1) her motion for judgment of acquittal because the government failed to provide sufficient evidence of her guilt beyond a reasonable doubt as to any of her four counts; and (2) her motion for a new trial by refusing to judicially estop to the government's position as to the count of conspiracy.

## II.

This court "reviews preserved challenges to the sufficiency of the evidence *de novo*, but is highly deferential to the verdict." *United States v. Rao*, 123 F.4th 270, 276 (5th Cir. 2024) (citation modified). It is not this court's role to determine "whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* (citation modified). Instead, it must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

Judicial estoppel "prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996). It "is an equitable doctrine invoked by a court at its discretion," *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001), that "protect[s] the integrity of the judicial process and [] prevent[s] unfair and manipulative use of the court system by litigants," *United States v. McCaskey*, 9 F.3d 368, 379 (5th Cir. 1993). Although "a district court's determination of judicial estoppel is reviewed for abuse of discretion" in civil cases, *Dacar v. Saybolt, L.P.*, 914 F.3d 917, 924 (5th Cir. 2018) (per curiam), we have not yet determined whether this standard of review also applies in a criminal case. We have only twice assumed—without deciding—that "the doctrine may be applied to the Government in a criminal case." *United States v. Farrar*, 876 F.3d 702, 709

(5th Cir. 2017). In *McCaskey* and *Cluff*, our review was for plain error because the defendants did not preserve their judicial estoppel claims by failing to object in the district court. *See McCaskey*, 9 F.3d at 378; *United States v. Cluff*, 857 F.3d 292, 301 (5th Cir. 2017). Thus, the standard of review for a preserved claim of judicial estoppel in a criminal case presents an issue of first impression.

## III.

### *A. Sufficiency of the Evidence*

Glover-Wing appeals each of her four convictions and seeks reversal of the district court's judgment on the basis that the evidence presented at trial to the jury was insufficient to sustain a guilty verdict. She first contests her three counts of healthcare fraud before turning to her one count of conspiracy.

### *1. Counts 2–4: healthcare fraud, 18 U.S.C. § 1347*

For Counts Two through Four of healthcare fraud under 18 U.S.C. § 1347, Glover-Wing recounts the evidence presented at trial regarding each of the three patients' medical conditions, certifications, and subsequent treatments under ACH's care. The crux of her argument points to the absence of any "allegation or evidence" that the patients (1) "did not actually suffer from the diseases with which they were diagnosed"; (2) "did not receive the services for which Medicare was billed"; (3) "were not certified for hospice care by one or more physicians"; and (4) were in fact fraudulently certified by Drs. Wiltz or Louis. As to the last point, she expounds her lack of knowledge based on her inadequate medical qualifications to determine fraudulence, if any, in the patients' diagnoses or certifications for hospice care.

The government labels Glover-Wing's contentions as meritless because the evidence at trial demonstrated her willfulness in billing Medicare for hospice services to patients whom "she knew were not terminally ill" and therefore ineligible for the reimbursement benefit. Acknowledging that even if Glover-Wing were correct in some of her characterizations, the government points to a fundamental flaw: she ignores the "critical fact that these individuals were not eligible to receive hospice services in the first place because they were not terminally ill." Citing testimony of Glover-Wing's instructions to her staff, the government claims the evidence at trial demonstrated that her knowledge of the fraudulent diagnoses, certifications, and (re)enrollment of patients was sufficient to sustain three guilty verdicts under § 1347.

We conclude that a rational trier of fact could find the evidence presented at trial sufficient to sustain a guilty verdict as to all three counts of healthcare fraud. Reviewing Glover-Wing's preserved claim *de novo* but highly deferential to the verdict, the evidence sustains the conclusion that Glover-Wing knew Alexander, Arsement, and Cooper were not terminally ill but were certified by her codefendants for hospice care to reap Medicare benefits. While Glover-Wing emphasizes the lack of evidence of fraud—that the patients *did* suffer from their certified conditions and *did* receive the services for which Medicare was billed—the material issue is whether Glover-Wing knew that these patients were *not* terminally ill and that she therefore "willfully" defrauded Medicare under § 1347. The evidence presented at trial—especially the conflicting diagnoses of those patients accompanied by testimony of Glover-Wing's instructions to her staff—spoke directly to that issue. Under the foregoing standard, which favors the prosecution, the evidence is sufficient for any rational trier of fact to determine that Glover-Wing knew Alexander, Arsement, and Cooper were

not terminally ill, but that she willfully sought their hospice care certification for reimbursements through Medicare.

### *2. Count 1: conspiracy to commit healthcare fraud, 18 U.S.C. § 1349*

For Count One of conspiracy to commit healthcare fraud under 18 U.S.C. § 1349, Glover-Wing disputes the district court's conclusion—that the evidence was sufficient to establish an existence of an agreement between Glover-Wing and her employees—in denying her motion for judgment of acquittal. She alleges that the district court erroneously read in "the existence of an agreement . . . to knowingly and willfully commit health-care fraud," when "nearly all" of the testifying employee-witnesses "quit, resigned, or were fired." She asserts that no evidence establishes any conspiratorial agreement as required under § 1349.

The government avers that Glover-Wing's focus is misplaced: whether the evidence established an agreement with her employees is inconsequential when such was sufficient to demonstrate one with her codefendants, Drs. Wiltz and Louis. Her emphasis on evidence of conspiracy with her employees, the government continues, fails to address the sufficient evidence of conspiracy with her codefendants, which the district court recognized. In support, the government cites cases in which this court has "repeatedly held that the acquittal of all other co-conspirators does not bar conviction for conspiracy," and concludes that Glover-Wing's contention here is immaterial. Returning to its main contention, the government maintains that the evidence "'overwhelming[ly]' showed that Glover-Wing orchestrated a scheme with Drs. Wiltz and Louis" to certify ineligible patients and reap Medicare benefits. Pointing to the "pay-to-play nature of the scheme," termination of unamenable medical directors, and instructions to staff to manipulate patient records, the government claims that a rational

juror would conclude a "tacit arrangement" amounting to an "agreement . . . to violate the law."

We also conclude that a rational juror could determine that the evidence here is sufficient to sustain a guilty verdict for Glover-Wing's conspiracy charge. To start, Glover-Wing's focus on evidence of an agreement with her employees is misplaced since her conspiracy conviction under § 1349 may be premised on an agreement with her codefendants notwithstanding their acquittals. *See United States v. Loe*, 248 F.3d 449, 459 & n.28 (5th Cir. 2001) (first citing *United States v. Zuniga-Salinas*, 952 F.2d 876, 877–78 (5th Cir. 1992) (en banc); and then citing *United States v. Bermea*, 30 F.3d 1539, 1554 (5th Cir. 1994)); *United States v. Ramirez-Velasquez*, 322 F.3d 868, 880 (5th Cir. 2003). Moreover, her position—that acquittal of her codefendants illustrates insufficient evidence of conspiracy—is unsupported and, as the district court articulated, plainly contradicts the foregoing precedent. Glover-Wing's position reduces to asking the court to review and construe the evidence *de novo* in a light that favors her interpretation. But this contravenes the standard that requires the court to be highly deferential to the verdict and to view the evidence in a light most favorable to the prosecution. Considering the evidence illustrating Glover-Wing's scheme of recruiting and rewarding medical directors, and her knowledge thereof based on her instructions to her staff, a rational trier of fact could easily conclude Glover-Wing's conspiratorial agreement to participate in Medicare fraud.

### B. *Judicial Estoppel*

The parties dispute (1) whether this court should review Glover-Wing's claim of judicial estoppel for abuse of discretion or *de novo*; and (2) whether judicial estoppel is at all applicable to the government in a criminal case. While Glover-Wing contends that *de novo* review applies because judicial estoppel is a question of law, the government contends that abuse-of-

discretion applies. The parties also stipulate that the question of whether the government may be judicially estopped in a criminal case remains unanswered, but disagree as to whether this appeal requires us to finally decide that question. Glover-Wing contends that judicial estoppel can and should apply here. The government does not argue that the doctrine is patently inapplicable to the government, but only urges us to avoid determining that question by disposing it—as this district court and other courts have—on the merits.

We need not determine the first question—the proper standard of review for a preserved judicial estoppel claim—because, by assuming without deciding that review is *de novo* and examining the merits of Glover-Wing's claim, we conclude that we also need not determine the second question— whether the government may be judicially estopped in a criminal case—when judicial estoppel simply does not apply to her case.

As noted, we have twice gone so far to only *assume* that the doctrine is applicable in this context. *See Farrar*, 876 F.3d at 709–10. In both *McCaskey* and *Cluff*, we reviewed the district courts' denials for plain error because neither defendant had preserved their judicial estoppel claims. *McCaskey*, 9 F.3d at 378–79; *Cluff*, 857 F.3d at 301. In *Farrar*, we only explored the applicability of the doctrine to a criminal defendant rather than the government, and our discussion there was dicta since we ultimately resolved *Farrar* on other grounds. 876 F.3d at 709–13 (exploring merits of judicial estoppel claim by assuming applicability before sidestepping by resolving on waiver). Likewise, in *Zedner v. United States*, the Supreme Court only considered the merits of the government's judicial estoppel claim against the defendant-petitioner in a criminal case before concluding that the claim failed to establish the requisite elements, similarly leaving unaddressed the question of the doctrine's general applicability in the criminal context. 547 U.S. 489, 504–06 (2006). Here, we follow suit and circumvent this

unresolved question because Glover-Wing similarly fails on the merits to establish the requisite factors of the doctrine. In other words, if we assess the factors of judicial estoppel that Glover-Wing must demonstrate, we easily see that it does not apply.

To invoke judicial estoppel, the party seeking its application must demonstrate that "(1) a party has asserted a position that is plainly inconsistent with a previously asserted position, (2) the earlier position was accepted by the court, and (3) the party did not act inadvertently." *Dacar*, 914 F.3d at 927. An additional factor the Supreme Court has discussed is "whether the party . . . would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Farrar*, 876 F.3d at 713 (quoting *Zedner*, 547 U.S. at 504).

On the first factor, it is unlikely that the government's position—that ACH employees may be considered coconspirators for purposes of the conspiracy count—was plainly inconsistent with its previous representations that Glover-Wing alleges limited the conspiracy to the three defendants (Glover-Wing, Dr. Wiltz, and Dr. Louis) listed in the indictment. She points to the government's representations in the context of its efforts to admit various statements by ACH employees under hearsay exceptions, but this inflates the scope of the government's representations to include the terms of the indictment never previously at issue. The indictment's terms—naming Glover-Wing, Drs. Wiltz and Louis, and "others both known and unknown" as members of the conspiracy—makes clear that the conspiracy charge is not limited, nor was it ever limited, to the named defendants. As the district court also concluded, the government's representations in the context of admitting employees' statements under hearsay exceptions were specific to that issue and were not a categorical declaration limiting the conspiracy charge to only those named in the indictment. Given that the terms of the indictment and jury instructions were never changed or

contested, it is difficult to discern any new position that the government ever assumed regarding the conspiracy charge, let alone one plainly inconsistent to any previous position.

As for the second factor, it is unclear that the district court ever accepted the government's purported earlier position. First, the terms of the indictment and the jury instructions were never changed or previously contested, and the government therefore did not present any new position as to the scope of the indictment and nature of the conspiracy charge for the district court to accept. Second, the district court did not modify or supplement the jury instructions in response to the jury's note; it merely pointed the jury back to the same instructions that it had already given. On these grounds, there appears to be no new position that the district court evidently accepted regarding the conspiracy charge. Neither does Glover-Wing identify any such moment of acceptance. Assuming *arguendo* that the district court's decision to admit employee testimony under the hearsay exception for coconspirator statements constitutes "acceptance" of the government's position, this contention suffers from the same defect: the record demonstrates that this representation was cabined to the discussion of admitting evidence under the Federal Rules of Evidence, and not to limit the scope of participants in the conspiracy.

As for the third factor, nothing in the record demonstrates that the government acted intentionally in its conduct. This third factor—that the party "did not act inadvertently"—is unclear since Glover-Wing offers nothing to demonstrate the government's intent to adopt a plainly inconsistent position to its advantage.

As for the last factor, Glover-Wing does not show any unfair detriment that she suffered because of the district court's refusal to apply judicial estoppel. Responsibility for any such detriment—that, in relying on the

government's representations, she forewent fashioning her defense against a conspiracy with anybody other than her codefendants—ultimately falls into her own lap. Glover-Wing had multiple opportunities to address her mistake that she now seeks to remedy through judicial estoppel. The government suggests, for example, that she could have sought clarification as to any ambiguities in the charging documents. Glover-Wing contends that she had "no reason to move to limit or narrow the indictment or the jury instructions" since the government had already done so based on its lack of evidence of a conspiracy with employees and its language in its closing argument. But that reasoning is circular because it still does not explain why she failed to raise these objections before trial and reinforces her misconception of the scope of the conspiracy charge. In the same vein, Glover-Wing does not elaborate on any unfair advantage that the government gained. As the jury was simply instructed to review the same instructions in response to its question, the government did not receive any unfair advantage over Glover-Wing, much less assume a new position with an unfair advantage.

## IV.

We conclude that the district court properly denied Glover-Wing's motion for a judgment of acquittal because a rational trier of fact could find the evidence presented at trial sufficient to sustain all four of her convictions. We further conclude that because Glover-Wing fails to establish the requisite factors to invoke judicial estoppel against the government, the doctrine is inapplicable to her case.

The judgment is AFFIRMED.